Welcome aboard. Our last case this morning is 20-4061, Donald Robertson Trust v. Brigham Young University. And for the appellant, Mr. Beard. Thank you, Your Honor. May it please the Court. I am William Beard, and I represent the Donald L. Robertson Trust. The Robertson Trust respectfully requests this Court to reverse the District Court's denial of its motion for leave to amend cross-claims for two reasons. First, as to the breach of contract cross-claim, it's at least plausible, in fact, more than plausible that the 1992 version of the BYUIP policy is a unilateral contract under Utah law. Second, as to the misappropriation cross-claim, the Trust pled and argued dates which fall within the three-year statute of limitations. Your Honor, turning to the breach of contract. While four different versions of the IP policy were pled, they were attached, three of them attached to the cross-claims. I will address the 1992 version because it presents the most plausible case of a unilateral contract between BYU and its professors relating to the Cox II development. Mr. Beard, can I ask you, and I don't mean to derail your plan, but I just have a yes or no question, if you could. Do you also allege that if the Court determines that the 2000 IP policy or the 2001 IP policy applies, that Dr. Robertson would be a beneficiary of that, of either one of those IP policies? Yes, Your Honor. The reason why all four of the policies were pled is because there was a dispute at the District Court level about which version applies to the Cox II development. And so, the Trust has pled alternative theories and believes that it could be successful under any of those theories. Because we're here on appeal on a motion for leave and it was dismissed by the District Court, we simply need to prove that at least one of those is a plausible case. And so, the 1992, I'll focus on that one. The facts that show are that during 1989 through 1992, when the Cox II was developed, two professors, Dr. Simmons and Dr. Robertson, were both BYU professors. Dr. Shea at that time was a BYU graduate student. At that time, BYU claimed ownership of the Cox II development under a BYU IP policy. It disclosed the Cox II to Congress as part of a joint development agreement. The 1992 intellectual property policy has mandatory terms. In particular, as to ownership, it states intellectual property developed by university personnel are the property of the university. Similar mandatory term as to compensation. The net income for distribution normally will be allocated to developers. Just two examples of mandatory terms from the 1992 version of the IP policy. So, let me understand that. The net income from the development, that is, any income that BYU realizes from the sale or use of any patent is going to be given to the developers? Is that what that says? That is correct, Your Honor. In fact, it goes further to state the percentage of the allocation. Under the 1992 version of the policy, it would retain 55% for the university and 45% would be distributed to the developers. It is not just patented technology. It is technology developed by the developers pursuant to their employment at the university. The reason, it would help me if you would focus on the reason we are here, and that client had not pled, a contract had been formed, what the terms and conditions of that contract were, what the consideration for the contract was, and then whether Professor Robertson had performed under the contract. If you could kind of walk me through where Judge Shelby blew it on analyzing those questions. I think the critical error is that there was a failure to consider whether or not a BYU IP policy is a unilateral contract that stands by itself. The district court was first concerned with, well, there has to be an underlying employment agreement to which Dr. Robertson would have signed, would have admitted, hey, I am a professor at BYU, and these are the terms of my contract. The district court required that the BYU IP policy be ancillary to the underlying employment agreement. Because the underlying employment agreement was not attached to or discussed in the amended cross-claims, the district court said there is no contract here. The court, in his opinion, said, well, I also will consider whether or not the IP policy is a standalone contract. But there he applied express contract law and did not go further and analyze whether it would be a unilateral contract under Utah law. In fact, Utah law says that the relevant evidence of intent is usually, in fact, is what is required to be considered. There you look to the language of the manual itself, you look to the employer's conduct, and you look to pertinent oral representations. That is from the Cabanas case, the Utah Supreme Court. All three of those types of evidence are pled as facts in the amended cross-claims. We have already talked about the ownership issue, the mandatory term there from the 1992 version of the policy. Yeah, just so I'm clear, the unilateral contract is the IPP policy that was in effect at the time the Celebrex was developed, you know, like 1989 to 1992? That's the relevant contract that we're looking at? That is correct, your honor. And when you look at the BYU IP policy, just like every university in the country, there is a policy that exists and is published to the employees. And over time, it gets amended. So we know that Dr. Robertson received a copy of that policy in 1980 when he became a professor. We know that it was amended in at least 1992. It was amended again in 2000. Again, that comes back to my other question. What were the terms and conditions of that contract that existed in 1992? And that's why I'm focusing on the 1992 version. The pleaded facts are that the development occurred on BYU's campus between 1989 and 1992. The 1992 version of the policy is attached to the cross-claims. And so the terms are expressly identified in the pleading as the attached document. In fact, those are in the record at Exhibit 1 to the cross-claims that's in the appellate record, Volume 2 at page 84, where the 1992 version of the IP policy is attached. And then what about the allegations that he performed under the terms and conditions of that policy and that BYU breached it? Those terms are also expressly pled. For example, in the pleading itself, in the amended cross-claims at page 75 of Volume 2, there it talks about the Cox2 development occurred from 1989 through 1992. It says that under the IP policy that was effective from 1989 through 1992, during the development of Cox2, BYU claimed ownership of the technology as the property of BYU. The next sentence, under the policy that was effective from 1989 to 1992, during the development of Cox2, BYU has a duty to distribute income to the individuals from the BYU who claimed ownership of Cox2. The 1992 policy is within that date of 1989 through 1992. And so, we're looking at what facts were pled. Is it a plausible case for breach of contract? The 1992 policy is expressly identified as the plausible contract that relates to Cox2 during that development. When you think about the different factors that you look to to determine whether it is a unilateral contract, you have to look not only to the terms itself, but also the conduct of the parties. BYU, Dr. Robertson, Dr. Shea have all consistently throughout the pleading of this case and their conduct with each other relative to Cox2, treated it as if it is a policy. I'm sorry, a unilateral contract that binds them. Isn't it true that they were relying on the 2000 and 2001 IP policies, at least from BYU standpoint? I mean, I don't know that either Dr. Simmons or Dr. Shea or BYU have ever said the 92 policy is operative for anybody. That is correct, your honor. And the question I would ask is, what is the plausible basis for BYU to be able to make that argument? It assumed ownership of the technology back in during the time period of 89 through 92. What was the vehicle for it to assume that? It was the policy that existed at that time and the fact that it was amended later. The parties might have agreed that we'll agree to go forward under an amendment, but that would require those parties to make that agreement. It doesn't nullify the fact that the underlying or the earlier policy that was in effect was controlling. Your honor, I see that I have four minutes. I'd like to reserve my time. You may. Thank you, counsel. Let's hear from Mr. Clark. You may proceed. Thank you. May it please the court. My name is Robert Clark. I'm here today on behalf of the Iqbal case describes the standard as one that requires the court to consider this as a context specific task that requires the reviewing court to draw on its judicial experience and common sense. In that regard, the context here is very significant because the research events happened 30 years ago. There is never an allegation anywhere that during that time period, Dr. Robertson made any kind of a disclosure to BYU. The litigation surrounding this started in the year 2006 and it was settled. The Pfizer case was settled in the year 2012. Dr. Robertson had given a deposition in that proceeding and was familiar with what the issues were there. After a settlement was reached with Pfizer, Dr. Simmons and Dr. Shea were both identified as having contributed to this. They couldn't agree on what their sharing percentage should be and so an internal process appropriately took place. In that internal process, Dr. Robertson was interviewed. It was not until 2014 that Dr. Robertson made an express claim that he had contributed, but at no time prior to that had he asserted any kind of the under any of these policies. Now, I want to talk about the big picture of the context of the policies that are involved. The entire purpose of the policies is to manage intellectual property that is developed there at the university. That implies that they will be aware of what it is. In order to manage it, they have created a technology transfer office. That entity is required to identify what is commercialized, what can be commercialized, take steps to protect what is disclosed to them, manage that, and manage the revenues that come from it. Is there anything in the 1992 IP policy that expressly or implicitly requires Dr. Robertson or any other faculty member to make a disclosure to Brigham Young that he or she is a potential developer? If so, can you point me to where that is? Yes. It is there. I don't mean to take up your time. You can tell me later in the argument. Your Honor, I believe that it is there. I am not putting my finger on it right now, but it will take me just one more minute. In fact, I should emphasize that the portion identified as the administrative processes is on page 86 of volume 2 of the appendix. It is the second paragraph, Roman numeral 3, developers shall fully disclose to the university of Michigan. Thank you. The standard that is required here requires the court, first of all, to do a careful analysis of what is included in the proposed cross-claim. That is a matter of what is included in those 10 pages of material. The 10 pages includes the caption and the signature page. When one looks at those pages for the well-pleaded facts, it is far different than what has been argued here today. In fact, it was curious to me that Dr. Robertson's trust currently alleges that it is the written 1992 policy that forms the basis for the contract. Indeed, the entirety of the allegations about the contract, paragraph 27 asserts that it is. We missed the last few seconds of your comment. I think that is true for all of it. The entirety of the complaint that asserts a breach of contract claim is contained in specific paragraphs of this 10-page document. Nowhere is there an assertion that the 1992 policy forms a policy. Paragraph 27 states that it is the IP policy that was in effect from 1989-1992 that forms the policy or that forms the contract. Then paragraph 33 presents the alternative that it is the 2001 IP policy. If he is alleging that the IP policy that was in effect from 1992-1992 is not a contract, why doesn't that encompass the 1992 IP policy? That policy was clearly not in effect throughout that period of time. At no time has he ever identified that policy as covering that time period. Of course, it is obvious that it comes at the tail end of that, but there is nothing in the complaint that would say how it became part of the contract. Indeed, there is no allegation that Dr. Robertson was ever aware of those policies. There is no allegation as to how he performed his duties under those policies. The whole idea of disclosure is that it is not simply a box to be checked. That is what allows the university to fulfill its duties to protect and commercialize. In fact, the law is quite clear that a unilateral contract is formed when a party accepts by performance all the material terms. What are the material terms of those provisions? Indeed, Dr. Robertson, during his lifetime, never made any allegation of that kind. This is all something that has been constructed after his demise. This is one of those situations where not only was Judge Shelby, and if you look at starting on page 13 of Judge Shelby's well-crafted opinion, you see all of the questions that he posed that are not addressed. He points out that this is a very amorphous, unsettled question. You look carefully at the allegations, and the factual basis really unravels. It is not specified whether a contract was written or oral, whether it was expressed or implied. He did have a policy because he attached it. I'm sorry? Judge Shelby was saying that about the 89 to 91 period, but there is no question about what the terms were in the 92 policy because he attached it to the proposed amendment to these claims. These claims are tethered, in fact, to his employment contract, but there is no allegation of how they are tethered, of what the connection is, which employment contract is implicated, and how he performed his duties under those. If you focus on the performance question just for a moment, the only allegation of performance is the one set out in paragraph 15 of the claim. That is the epitome of a conclusory allegation that says nothing about disclosure, says nothing about how he cooperated. These policies talk about how if there is a dispute among developers, that they are required to submit that dispute to the university before any obligation to distribute arises. Mr. Clark, how do you address opposing counsel's argument about rule 9C? He says that it was a generalized allegation with regard to performance. Performance is a conditioned precedent to the contract. The rule specifically authorizes a generalized allegation of a conditioned precedent. Why is that wrong? That is a great question. In that regard, I think it is important to consider the impact of Utah law as it relates to this. Under Utah law, number one, if you are alleging a unilateral contract, you have to allege performance. Number two, if you are alleging any other kind of contract, performance by the claimant is one of the elements required under Utah law. The factual basis for a conclusory allegation needs to show up in the complaint. It is just there. In fact, the idea that if multiple developers are involved in a development, that they need to come up with the appropriate sharing formula. These are things that the whole concept of why policies exist is to address the concern that we are now faced with. Clark, can I ask you another question? I am sorry to take up so much of your time. In 1992, let's say to 2012, I don't think anybody, Dr. Simmons, Dr. Shea, Dr. Robertson, made any disclosures. It would have been academic. There was no money. There was no tangible product of any developer's work. In 2012, 17 years after Dr. Robertson leaves the university, BYU comes into $450 billion, I think $190 billion ultimately to be divvied up among developers. As you pointed out just a moment ago, the 92 policy contemplates disclosure in the event of a dispute among the developers. Dr. Robertson, when he left the university in 1995, he didn't know if there would ever be any money to come up this work from 89 to 92. He didn't know if there was going to be any dispute. Why can you fault him for not performing by making a disclosure when there's no reason for him to have made a disclosure? It wouldn't have been any reason for Dr. Simmons to make a disclosure. Your Honor, that is a terrific question. Actually, though, I want to point out to the court that the record is very clear. Dr. Simmons made a detailed disclosure, signed an affidavit clear back in the 1989 and 1990 timeframe, explaining the research that had been done, explaining in detail how he saw this as valuable. In fact, that was what formed the basis for the technology transfer office working on an agreement that eventually resulted in this being disclosed to Pfizer. Dr. Robertson did nothing of the sort. There's no indication or allegation of that sort. Thank you, counsel. Your time expired. Let's turn to rebuttal from Mr Beard. Thank you, Your Honors. Returning to the point about performance, does the contract speak to? I'm sorry. Does the amended cross claim contain facts regarding his performance? Your Honor, Council just argued that the 10 pages of the amended cross plan what we look to. But we must also consider the documents that are attached in Exhibit 4 to the amended cross claim is at Volume 2, page 133 of the record. This is the letter that Dr. Robertson himself wrote to BYU immediately after he was called to testify in the dispute between Dr. Shea and Dr. Simmons. It's a four-page letter where Dr. Robertson, in his own words, explains, I am a developer as well, and you should consider me as well. He goes through in good detail about his specific scientific contributions. Particularly at page 134, he talks about how his laboratory notebooks provide the evidence that he too made contributions to COX-2. And while he was in the process of testifying on behalf of Dr. Shea, he comes to conclusions. Wow, this is the kind of contributions that entitle people to development. Okay, well, you guys need to know that I too made real contributions to the COX-2 development. So is there evidence that he performed under the contract? When you think about the 1992 version of the policy, Your Honor raised the question, what is required? Contract merely requires that you make a scientific development, and then all of a sudden the requirement kicks in that you should be compensated for that. The specific requirement about disclosure is so that the university can make a strategic decision about whether or not to patent it. But BYU had full control of COX-2 and decided not to patent it. So it's not a question of whether COX-2 was disclosed to them. The IP policy doesn't state anything about whether the specific developer's names need to be devolved or provided, but of course that would be inherent in the disclosure. The other thing I would submit is Dr. Shea also didn't submit anything in the time period, but yet in 2012 when BYU was trying to consider who it had a duty to distribute income to, it considered Dr. Shea. Dr. Shea never made a prior disclosure either. It also considered Dr. Robertson, who was alleged didn't make a disclosure. But that's not what's required under the contract, and that's why it's not a condition preceding. What about page... I'm sorry, go ahead. Your Honor was correct to point out that Rule 9c says that all conditions precede and may be generally pled, and so it's not, it's kind of beside the point whether or not the pleading specifically includes those facts, but of course it does. Your Honor, a final point on the performance. I think that this point about him being talked about in the meeting on June 6, 2012 when BYU was trying to consider who to distribute the funds to is most telling. The mere fact that he was one of the professors who was considered and a decision was made not to distribute to him is in fact telling. At that time, the university knew that it owed a duty to Dr. Robertson, and the only plausible conclusion for that is that it stems from the IP policy which it had with its professors. Thank you. Thank you, counsel. We appreciate your arguments. Counsel are excused, and the case shall be submitted.